UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TROY COCHRAN,

       Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

       Defendant.

Case No. 09-cv-11752
United States District Judge Paul D. Borman

_____/

OPINION AND ORDER
(1) GRANTING DEFENDANT'S MOTION FOR ENTRY OF JUDGMENT AFFIRMING THE
DENIAL OF LONG TERM DISABILITY BENEFITS (DKT. NO. 18) and
(2) DENYING PLAINTIFF'S MOTION TO REVERSE BENEFITS DECISION (DKT. NO. 20)

This matter is before the Court on Defendant Hartford Life and Accident Insurance
Company's ("Hartford") Motion for Entry of Judgment Affirming Denial of Long Term Disability
Benefits (Dkt. No. 18) and Plaintiff's Motion to Reverse Benefits Decision (Dkt. No. 20) . Plaintiff
has filed a response (Dkt. No. 24) and a reply (Dkt. No. 26). Hartford has filed a response (Dkt. No.
23) and a reply (Dkt. No. 25). Pursuant to Local Rule 7.1(e)(2), the Court has decided the parties'
cross-motions without a hearing. Having considered the entire record, reviewed the parties'
respective briefs and for the reasons that follow, the Court GRANTS Hartford's Motion for Entry
of Judgment Affirming Denial of Long Term Disability Benefits and DENIES Plaintiff's Motion
to Reverse Benefits Decision.

## I.    BACKGROUND

Plaintiff was employed as a warehouse/shipping associate at Saint-Gobain Corporation and was a beneficiary under an employee welfare plan that provided both short ("STD") and long ("LTD") term disability benefits.  On March 26, 2006, Plaintiff injured his ankle in a non-work-related automobile accident, in connection with which he was cited for driving while intoxicated. (AR 00603-605.)[1]  Plaintiff applied for and received STD benefits effective March 28, 2006 and continued to receive STD benefits until September 26, 2006, the maximum amount of time that such benefits are permitted under the applicable plan.  (AR 00704, 00701, 00649.)  Plaintiff was informed that if he expected his disability to continue beyond September 26, 2006, he should apply for LTD benefits.  (AR 00649.)

Plaintiff did apply for LTD benefits, which he received until September 28, 2008, based upon a determination that he was not able to perform the essential duties of his *own* job as a warehouse shipping associate.  Plaintiff was informed on January 24, 2007, that under the terms of the applicable plan, Plaintiff would not be considered disabled *after* September 28, 2008, if he was not

---

[1] Citations to "AR" are to the Administrative Record which was filed under seal with the Court on October 6, 2009 (Dkt. No. 16) pursuant to stipulation of the parties (Dkt. No. 15).  Pursuant to the Stipulated Case Management Order entered by this Court on August 28, 2009, the parties were required to file any disputes regarding the completeness of the Administrative Record on or before September 28, 2009.  (Dkt. No. 12 ¶ 3.)  No objections to the record's completeness were filed by either party.  As this Court noted in its August 28, 2009 Stipulated Case Management Order, "this matter is governed solely by the administrative record, and discovery is neither sought nor permitted in this action."  (Dkt. No. 12 ¶ 2.)  As the parties have stipulated that the record is complete, this Court does not consider any matters presented by the parties in their cross-motions which are not a part of the Administrative Record.  *See Wilkins v. Baptist Health Care Sys., Inc.,* 150 F.3d 609, 614 (6th Cir. 1998) (district court is confined to the record that was before the Plan administrator); *Peruzzi v. Summa Medical Plan,* 137 F.3d 431, 433-34 (6th Cir. 1998) (only materials considered by the plan administrator may be considered in determining whether denial of coverage was arbitrary and capricious).

2

prevented from performing one or more of the essential duties of *any* occupation for which he was trained and qualified and which offered the requisite earnings potential.  (AR 00572.)  Based upon the record evidence, including both medical and vocational documentation, Hartford made the determination that Plaintiff was no longer disabled as of September 28, 2008 from performing the essential duties of "any occupation" under the terms of the plan.  (AR 00426-430.)  It is Hartford's determination on Plaintiff's eligibility for LTD benefits under the "any occupation" standard that Plaintiff now challenges in this Court.

**A.    The Provisions of the Plan**

Plaintiff's employer, Saint Gobain, sponsored a Long Term Group Disability Benefit Plan ("the Plan").  (AR 00006-00061.)  The Plan is insured by Hartford through Policy No. GLT-675408 ("the Policy").  (AR 00009-00010.)  The Plan benefits are subject to the Policy's terms and provisions, which are incorporated into, and form a part of, the Plan.  (AR 00036.)  The Plan designates Plaintiff's employer, Saint-Gobain Corporation, as the Plan sponsor and administrator.  (AR 00036.)  The Plan designates Hartford as the claims fiduciary for benefits under the Policy and grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (AR 00036.)  Hartford utilized the services of Disability Management Alternatives LLC ("DMA") to assist with claims administration.

The Plan provides LTD benefits to covered employees who become disabled while insured under the Plan.  (AR 00013.)  The Plan defines "disability" and "disabled" in pertinent part as follows:

"Disability or Disabled" means:

1.    during the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation;

3

2.      for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Pre-disability Earnings;

3.      after that, you are prevented from performing one or more the Essential Duties of Any Occupation.

(AR 00023.)  The Plan defines "Essential Duty" as a duty that (1) is substantial, not incidental, (2) is fundamental or inherent to the occupation, and (3) can not be reasonably omitted or changed.  (AR 00023.)  Thus, under the Plan, for the first 24 months the standard for disability is the employee's ability to perform the essential duties of his or her "own" occupation.  After the first 24 months, the standard for disability is the employee's ability to perform the essential duties of "any" occupation. The Plan defines "Any Occupation" as follows:

Any Occupation means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance."

(AR 00022.)  For Plaintiff, an occupation would meet the Plan's earnings potential requirement if it would provide an expected income of $2,100.32 per month or $12.12 per hour on a full-time basis. (AR 00022, 00474, 00627.)

The Plan sets forth the process for filing a claim, and includes a requirement that a claimant provide initial and continuing Proof of Loss (documentation of disability).  (AR 00019-00020.)  The Plan also describes the denial and appeal process, and allows a claimant to request all of the material relied upon by Hartford in support of its denial.  (AR 00021, 00039.)  The Plan provides for appeal of an initial benefit determination and Hartford commits to review on appeal "all comments, documents, records and other information submitted by [the claimant] relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."

4

(AR 00039.)

**B.      Plaintiff's Receipt of Benefits Under the Plan and Training by Hartford in His Chosen Vocation of Tattoo Artist**

Following his March 26, 2006 automobile accident and ankle fracture, Plaintiff was unable to work and was approved for receipt of STD benefits effective March 28, 2006. Plaintiff continued to receive STD benefits until September 26, 2006, the maximum allowable time under the Plan. (AR 000649, 00701, 00704.) Plaintiff was informed on September 5, 2006 that he would have to apply for LTD benefits under the Plan if he expected that his disability would continue beyond the expiration of his STD benefits on September 26, 2006. (AR 00649.) Plaintiff did apply for LTD benefits and was approved under the "own occupation" standard, effective September 28, 2006. (AR 00571-00574.) Plaintiff was informed at the time he was approved under the 24 month "own occupation" standard that as of September 28, 2008 he would be required to meet the more discerning "any occupation" standard, under which he would continue to meet the definition of "disabled" under the Plan only if he was prevented from performing one or more of the Essential Duties of "any occupation." (AR 000572.)

In September 2006, Plaintiff indicated an interest in possible retraining in computer technology. (AR 00351.) In January, 2007 Plaintiff indicated that he was interested in vocational training assistance. (AR 00270.) In April, 2007, DMA referred Plaintiff's case to Seacoast Rehabilitation, LLC to obtain a Labor Market Survey based on Plaintiff's interest in computer training and his intent to obtain a Microsoft Certified Professional Certification. (AR 00242.) The Labor Market Survey disclosed numerous jobs in the relevant market, at the relevant pay grade. (AR 00242-249.) Plaintiff, however, decided that he was no longer interested in pursuing computer training. (AR 00168.)

Plaintiff ultimately decided that he wanted to be trained as a tattoo artist and DMA again commissioned Seacoast LLC to conduct a Labor Market Survey for tattoo artists, which disclosed multiple employment opportunities in the relevant market area, suitable to Plaintiff's functional capabilities and wage requirements. (AR 00447-00454.) Several of the businesses indicated stable hiring activity over the past year and some expected growth in the business and were specifically looking for new hires. (AR 00448-00454.)

Plaintiff entered into an Apprenticeship Training Agreement with Hartford that specifically designated a full-time position as a Tattoo Artist as Plaintiff's vocational goal. (AR 00515-00519.) Plaintiff's Return to Work Plan under the Apprenticeship Training Agreement included Plaintiff's participation in a 312-hour apprenticeship program and his attendance at an OASHA Blood Borne Pathogen course, which was required by many of the businesses identified in the Labor Market Survey. (AR 000515-00516.) Under the Return to Work Plan, Hartford agreed to pay the cost of the apprenticeship and the OASHA course, in addition to purchasing tools and equipment for Plaintiff, investing approximately $6,500.00 in Plaintiff's training and preparation for his chosen vocation. (AR 00516.) Plaintiff acknowledged in the Return to Work Plan that he would "be considered reasonably employable at the completion or near completion of the Apprenticeship program." (AR 00516.) Plaintiff's job duties during his apprenticeship included set up and maintenance of his own tattoo station and application of tattoos to customers. (AR 00461, 00466, 00481, 00488, 00499.) Plaintiff performed well throughout the apprenticeship program, receiving marks of "excellent" from his mentor, without notation of any physical difficulties in performing the work. (AR 00466.)

### C. Plaintiff's Ability to Perform the Essential Functions of "Any Occupation"

Hartford explained to Plaintiff when it approved his receipt of disability benefits under the "own occupation" standard, if Plaintiff remained disabled after September 28, 2008, he would be considered disabled under the terms of the Plan only if he could demonstrate that he met the more exacting "any occupation" standard.  (AR 00572.)  Pursuant to the Plan, Hartford continued to monitor Plaintiff's disabled status, regularly requesting documentation and medical information from both his treating physician and his rehabilitation counselor.

Plaintiff's treating physician, Dr. Tudor Tien, indicated in a November 13, 2007 "Attending Physician's Statement of Disability" that Plaintiff had no limitations on use of hands or arms, no limitations on driving or repetitive hand motions, no limitations on sitting and was capable of minimal reaching and working overhead.  (AR 00505-00506.)  In an April 25, 2008 Attending Physician's Statement of Functionality, Dr. Tien indicated that Plaintiff could sit for 8 hours, could stand for 2 hours and walk for 3 hours each day, with the use of a cane.  (AR 00484-00485.)  The April 25, 2008 functionality report also indicated that Plaintiff could lift and carry up to 10 pounds frequently, could occasionally bend at the waist, never crouch, could drive without limitation and reach, finger and handle occasionally.  (AR 00485.)

Upon completion of his tattoo apprenticeship program, Plaintiff's vocational rehabilitation counselor contacted Plaintiff's treating physician, Dr. Tien, for an acknowledgment that Plaintiff was in fact capable of physically performing the day to day tasks of his chosen vocation as a tattoo artist.  In a June 12, 2008 letter to Dr. Tien seeking his opinion, the vocational rehabilitation counselor explained:

> As you may be aware, Mr. Cochran recently completed his vocational training as certified Tattoo Artist and is currently working.
>
> The occupation as a Tattoo Artist is sedentary with some occasional standing and

> walking which is consistent with the functional capacities form completed by you on
> 04/25/2008.  The occupation also requires frequent to constant reach, handle and
> finger.
>
> Given the fact that Mr. Cochran is currently working and performing frequent to
> constant reach, handle and finger, do you agree that he is capable at this level work?

(AR 00473.)  On June 16, 2008, Dr. Tien signed the letter, indicating that in his opinion, Plaintiff

was capable of the work as described, including specifically "constant reach, handle and finger."

Hartford also commissioned an Employability Analysis Report ("EAR") which was issued

on June 19, 2008, and identified two occupations (eyeglass frames polisher and lens-block gauger)

that met the relevant functionality and wage requirements for Plaintiff's employability and also were

found to be "prevalent" and within Plaintiff's skill range.  (AR 00433.)  The EAR utilized the

Occupational Access System ("OAS"), a computerized job matching system that cross references

an individual's "qualifications profile" with over 12,000 occupations classified by the Department

of Labor in the Dictionary of Occupational Titles ("DOT").  (AR 00432.)  The Report noted that

these two occupations were in addition to the occupation of tattoo artist, which also was determined

to meet the applicable earnings and functionality requirements.  (AR 00432-00433.)  The EAR

concluded: "Results of the employability analysis determined that Mr. Cochran possesses

transferable skills required to perform at least 3 occupations that he has education and training for

within 67% of his pre-disability indexed wages.  This determination is based on the preponderance

of medical evidence provided to me from Mr. Cochran's file.  Please note that this Employability

Analysis Report is based solely on Mr. Cochran's residual physical function."  (AR 00432.)  All of

the "Profile Adjustments/Considerations" relied on in the Employability Analysis Report came

directly from conclusions contained in Dr. Tien's evaluations of November 13, 2007,   April 25,

2008 and June 12, 2008.  (AR 00432-00433.)

8

**D.      Hartford's Decision That Plaintiff Did Not Meet the "Any Occupation" Standard**

On July 31, 2008, Hartford notified Plaintiff that he did not meet the policy definition of disability beyond September 27, 2008, i.e. that he did not meet the "any occupation" standard.  (AR 00426-00430.)  Hartford explained the reasoned basis for its decision:

> We based our decision to terminate your claim on policy language. All the papers contained in your file were viewed as a whole.  This included:
>
> * The Long Term Disability Income Benefits Questionnaire received on September 11, 2006;
>
> * The Attending Physician's Statement signed by Dr. Tudor Tien on April 25, 2008;
>
> * Office notes and medical records from Dr. Tudor Tien form March 31, 2006 through May 2, 2008;
>
> * Employability Analysis information completed by a Vocational Rehabilitation Clinical Case Manager on June 19, 2008;
>
> * Labor Market Survey completed by a Vocational Rehabilitation Consultant on July 11, 2007; and
>
> * Your education, training and experience described on the History of Work and Education with Pension Questionnaire form received on May 5, 2008.

(AR 00428-00429.)   The letter further indicated that Hartford reviewed all of the medical information in Plaintiff's file to decide if Plaintiff continued to meet the definition of disability.  (AR 00429.)

Hartford determined, based upon the evidence reviewed, that Plaintiff was qualified to work in sedentary occupations, including by way of example the occupations of eyeglass frames polisher and lens-block gauger, and that those occupations met the earnings potential required under the Policy.  (AR 00429.)  Hartford also determined, based on the July 11, 2007 Labor Market Survey for Tattoo Artists, that positions existed in the relevant geographic area for Tattoo Artist and that

9

Plaintiff met the functional capability and training requirements of that occupation, which also met the earning potential required under the Policy.  The letter concluded: "Based on this information, we have concluded that you are not prevented from performing the essential duties of Any Occupation.  Because of this, you will not meet the policy definition of Disability as of September 28, 2008 and your LTD benefits will terminate on that date."  (AR 00429.)

The letter informed Plaintiff of his rights under ERISA to pursue an appeal of Hartford's decision, which Plaintiff did by letter dated January 5, 2009.  (AR 00198.)  Despite the fact that the Plan invited Plaintiff to submit with his appeal "any written comments, documents, records, and other information" relating to his claim, and although Plaintiff's attorney indicated in his January 5, 2009 letter that further information from Dr. Tien would be forthcoming, Plaintiff never submitted anything further in support of his appeal and never identified a basis for his appeal or his reasons for challenging Hartford's decision.  (AR 00198.)

In a letter dated February 9, 2009, Plaintiff was notified of the appeal committee's decision, based upon a "complete and independent review," to uphold Hartford's denial of benefits: "Based upon the comprehensive review of the available information we have determined that the Company's decision to terminate benefits as of September 27, 2008 was correct."  (AR 00178-00179.)  The appeal committee's decision specifically noted Dr. Tien's findings and conclusions regarding Plaintiff's functional capabilities, the independent vocational and labor market surveys that were conducted, and Plaintiff's training and work as a tattoo artist in reaching its conclusion that Plaintiff's condition did not prevent him from performing one or more of the essential duties of "any occupation."  (AR 00178-00179.)

## II.    STANDARD OF REVIEW

10

Generally, a challenge to a denial of benefits under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, is reviewed *de novo,* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1988).  Where a plan administrator has discretionary authority to determine benefits, courts will "review a decision to deny benefits under 'the highly deferential arbitrary and capricious standard of review.'" *Sanford v. Harvard Indus., Inc.,* 262 F.3d 590, 595 (6th Cir. 2001) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996)).

The Plan in the instant case designates Hartford as the claims fiduciary for benefits under the Policy and grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  (AR 00036.)  Courts have consistently held that this type of unequivocal plan language vests the plan administrator with the discretionary authority that mandates review under the arbitrary and capricious standard.  *See Osborne v. Hartford Life and Acc. Ins. Co.,* 465 F.3d 296, 299 (6th Cir. 2007) (citing *Yeager, supra*). "'[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action.  When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions.  Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *McDonald v. Western-Southern Life Insurance Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (quoting *Williams v. Int'l Paper Co.,* 227 F.3d

11

706, 712 (6th Cir. 2000).[2]

While courts have recognized that when the plan authorizes the fiduciary to both determine eligibility and provide benefit payments there is a potential for a conflict of interest, the Sixth Circuit has expressly held that this potential is simply a factor to be considered and does not alter the deferential "arbitrary and capricious" standard of review. *See Peruzzi, supra* at 433 (conflict of interest is a factor to be considered but does not change the standard of review); *Osborne, supra* at 300 (requiring "significant evidence" that an alleged conflict of interest affected the administrator's decision).

## III.    ANALYSIS

### A.    Hartford's Obligations to Plaintiff Under the "Any Occupation" Standard

Under the "any occupation" standard, a plan administrator is "under a duty to make a reasonable inquiry into the types of skills [a claimant] possesses and whether those skills may be used at another job that can pay [him] the same salary range as [his pre-disability earnings]." *McDonald, supra* at 172. It is true, as Plaintiff points out, that the "any occupation" standard "cannot be construed so narrowly that an individual must be utterly helpless to be considered disabled and that nominal employment, such as selling peanuts or pencils which would only yield

---

[2] Plaintiff implies that the Policy language (Plaintiff does not identify which Policy language) is somehow ambiguous, inferring that the principle of *contra proferentem*, under which ambiguities in a contract are construed against the drafter, should be applied to interpret the terms of the Plan. (Pl.'s Br. 7.) However, plan administrators are given great latitude in interpreting ambiguous terms when the plan vests them with discretionary authority to determine eligibility for benefits. *Moos v. Square D Co.,* 72 F.3d 39, 42 (6th Cir. 1995). *See also Peach v. Ultramar Diamond Shamrock,* 229 F. Supp. 2d 759, 766 (E.D. Mich. 2002) (recognizing that the doctrine of *contra proferentem* is inconsistent with the deferential arbitrary and capricious standard under which the plan administrator's decision is reviewed) (citing *Admin. Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 986 (6th Cir. 1999)).

a pittance, does not constitute a 'business or occupation.'" *Id*. A plan administrator is obligated to inquire into a claimant's skill set and the transferability of those skills as well as the claimant's functional ability to perform any potential identified occupations: "Just as a plan administrator must make some inquiry into the nature and transferability of a claimant's job skills, a plan administrator must make some inquiry into whether the jobs selected are ones that the claimant can reasonably perform in light of specific disabilities." *Brooking v. Hartford Life and Accident Ins. Co*., 167 F. App'x 544, 549 (6th Cir. 2006).

The plan administrator's obligations are not, however, without limits and there is no requirement that "a full-blown vocational evaluation" be done in every instance. *McDonald*, *supra* at 172. *See also Silvey v. FMC Corp. Long-Term Disability* Plan, No. 95-6251, 1996 WL 690156 (6th Cir. Nov. 27, 1996) (unpublished) (finding that no court has suggested "that it is incumbent on plan administrator to conduct a detailed review of available jobs in order to demonstrate that a plaintiff is employable"). Many courts recognize that the "any" occupation standard is not particularly demanding and in many cases have found that no vocational evidence is required, particularly where the claimant is capable of light to sedentary work. *Cf. Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1455 (D.C. Cir. 1992) (failure to identify jobs in the relevant geographic that were actually available not arbitrary and capricious where no provision of the policy required Pitney Bowes to ensure availability of an alternative job and claimant, who suffered a knee injury, was not terribly medically limited); *Richey v. Hartford Life & Accident Ins. Co*., 608 F. Supp. 2d 1306, 1312 (M.D. Fla. 2009) (holding that determining benefits eligibility under an "any occupation" standard does not require vocation evidence to establish occupational availability).

The facts of a particular case will dictate the specifics of the plan administrator's obligations,

but under no circumstances is there a duty imposed on the plan administrator to actually find a claimant a job or guarantee a claimant's actual marketability. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994) (finding that Texaco's disability benefits plan was "not a form of employment insurance" and that it was not incumbent on the plan administrator "to insure the availability of an alternative job" before terminating benefits). *See also Perez v. Aetna Life Ins. Co.*, No. 95-1111, 2000 WL 191904 at * 3 (6th Cir. Feb. 10, 2000) (unpublished) ("[N]othing in the disability policy requires that plaintiff be competitively employable or be actually able to find a job. . . . [H]e need only be shown to be able to perform jobs that other people with similar education, training and experience are performing."); *Biljan v. Aetna Life Ins. Co.*, 189 F. App'x 423, 426 (6th Cir. 2006) (holding that Aetna must consider whether claimant is qualified and able to work at a "reasonable occupation" considering claimant's training and experience but that "[n]othing requires Aetna actually to provide the claimant with a job"); *Jestings v. New England Telephone and Telegraph Co.,* 757 F.2d 8, 10 (1st Cir. 1985) (holding that "incapable" of performing under the any occupation standard refers to ability or capacity, not opportunity).

**B.   Hartford's Decision to Terminate Plaintiff's Benefits Under the "Any Occupation" Standard**

In reaching its conclusion that Plaintiff was not disabled under the "any occupation" standard, Hartford fulfilled its obligation to inquire into Plaintiff's skill set, and the transferability of those skills, and to assess Plaintiff's functional capabilities to perform the jobs that it identified. This is particularly true with respect to Hartford's efforts to prepare Plaintiff to return to work in his chosen profession of tattoo artist. Hartford considered all of the relevant medical evidence, which amounted to the statements and notes of Plaintiff's own treating physician. (AR 00484, 00473, 00476, 00484-00485, 00505-00506, 00544-00545, 00644-00646,00652-00654, 00671, 00677,

14

00690, 00695-00697).  Plaintiff never contested any of Dr. Tien's conclusions and never offered any competing medical evidence or opinions.  There was no "battle of the experts" and although given the opportunity to provide additional evidence in the appeal process of his claimed disability under the "any occupation" standard, Plaintiff offered nothing to supplement this record.

Hartford also commissioned and relied on the EAR prepared by a vocational rehabilitation clinical case manger, which concluded that Plaintiff was employable at the sedentary level in at least three identified occupations, considering Plaintiff's skills and physical functionality as well as the prevalence of these occupations in Plaintiff's geographic area.  (AR 00432-00433).  Hartford reasonably relied on this EAR, which utilized the OASYS job matching system.  *See Richey, supra* at 1312 (recognizing that it was reasonable for the plan administrator to rely on an employability analysis utilizing the OASYS system as evidence that plaintiff was not incapable of working under the "any occupation" standard).

Hartford also commissioned and relied on a separate Labor Market Survey, specific to Plaintiff's chosen profession of tattoo artist.  (AR 00447-00454.)  This survey demonstrated that the occupation of tattoo artist was within Plaintiff's training and experience (which Hartford had paid for), was prevalent in the community, and met the earning requirements under the Plan.  (AR 00447-00454.)[3]  Although Plaintiff claims that this survey was "flawed," there is no evidence in the

---

[3] Plaintiff states in his brief that none of the tattoo shops identified in the survey were hiring but this is contradicted by the evidence.  The Emporium Tattoo, Inc. indicated that hiring had been stable but that "there could be an opening within the near future if demands continue to rise."  (AR 00448.) Indian Ink Tattoos indicated that they "will need someone within the near future, as the shop will be moving to a bigger area."  (AR 00450.)  Liquid Tattoo Body Piercing indicated that "they are always interested in new applicants and apprenticeship programs."  (AR 00451.)  Precision Ink Tattoo, where Plaintiff did his apprenticeship, indicated that they were planning to have Plaintiff set up shop there and grow his own business.  (AR 00461.)  Plaintiff states that he was "let go" from Precision because there was no work for him, but there is no evidence in the record that this

15

record to support this assertion and no evidence that Hartford's reliance on that survey was arbitrary and capricious.

Hartford's reasonably concluded that Plaintiff was not disabled from performing one or more of the essential functions of "any occupation" based upon the uncontradicted facts that: (1) Plaintiff's own treating physician opined that Plaintiff could sit for 8 hours a day, stand for 2 hours a day, walk for 3 hours day with the use of a cane, frequently lift and carry up to 10 pounds, and constantly reach, finger and handle;[4] (2) Plaintiff was trained and qualified for a position as a tattoo artist and had been working effectively as a tattoo artist for approximately 8 months; (3) Plaintiff's own treating physician opined that Plaintiff was functionally capable of performing the vocational requirements of a tattoo artist and of an eyeglass frames polisher and lens-block gauger;[5] and (4) a

---

happened.  There is evidence that Plaintiff needed to work on his "communication and listening skills" in working with clients at Precision Ink, but this is clearly unrelated to his claimed disability. (AR 00440.)  If in fact Plaintiff did not set up shop at Precision Ink, as was the plan, we can only speculate as to why as Plaintiff offers no evidence on this issue.  Perhaps Plaintiff simply did not put the effort in to developing his own book of business.  Again, we can only speculate.  There is no evidence that Plaintiff applied for a tattoo job elsewhere, and was refused employment.

[4] Plaintiff offers several "red herrings" in his briefs which merit only brief attention.  One such example is Plaintiff's argument that under the reasoning of *Kramer v. Paul Revere Life Ins. Co.,* 571 F.3d 499, 507 (6th Cir. 2009), Hartford was obligated to show an improvement in Plaintiff's condition to justify termination of benefits. (Pl.'s Br. 7.)  *Kramer* does not stand for this proposition and did not involve a change in standards under the plan at issue from the "own" to the "any" occupation standard.  The standard in *Kramer* remained "own" and the court found it was arbitrary and capricious to terminate benefits without a demonstrated change in plaintiff's condition.  In the instant case, under the terms of the Policy, the standard itself changed and Hartford concluded that Plaintiff was no longer disabled under that new standard.

[5] Plaintiff criticizes the Employability Analysis Report (AR 00432-00438) ("EAR"), arguing that Plaintiff was not qualified for the positions of eyeglass frames polisher and lens-block cleaner identified in that report.  (Pl.'s Br. 7-9.)  First, the argument relies on evidence outside the Administrative Record, i.e. an O*NET Online summary report for grinding, lapping etc. (Pl.'s Br. Ex. 5.)  This evidence was never considered by Hartford in its initial denial or in its appeal review and there is no indication that it is even relevant to the occupations noted in the EAR.  The Court cannot consider evidence outside the agreed upon Administrative Record.  *See Wilkins, supra* 150

16

Labor Market Survey indicated that several tattoo establishments within Plaintiff's relevant geographic area offered the potential earnings required under the Plan and that some of those were in a position to hire.[6]

It is difficult to imagine what more Hartford could have done for Plaintiff, short of actually securing him employment, which Hartford clearly had no legal obligation to do.[7]  Hartford made a reasoned decision, based on the entire Administrative Record, that Plaintiff was capable of

_____

F.3d at 615.  Second, Plaintiff cannot demonstrate that it was arbitrary and capricious for Hartford to rely on the EAR's independent analysis, which was based on the restrictions and limitations provided by Plaintiff's own treating physician, and which identified occupations for which Plaintiff was qualified and which met the Plan's earnings potential requirements. (AR 00432-00433, 00474.) *See Richey, supra* at 1312.  Finally, Plaintiff does not deny that he was capable of performing the essential duties of a tattoo artist, a separate and viable occupational option specifically chosen by Plaintiff himself.  Plaintiff cites no law to support the inferred argument that Hartford was obligated to identify more than one occupation for which Plaintiff was qualified and which met the functional capability and wage requirements under the Plan.

[6] Plaintiff argues, with no citation to any record evidence, that the occupation of tattoo artist did not meet the Plan's earning potential requirements but this statement is directly contradicted by the record evidence and Plaintiff offers nothing, other than unsupported opinion, to support his contrary assertion. (Pl.'s Br. 9.)  For Plaintiff, under the "any occupation" standard, an occupation was required to provide an expected income of $2,100.32 per month or $12.12 per hour.  (AR 00022, 00474, 00627.)  The Labor Market Survey on which Hartford relied to determine that the occupation of tattoo artist met that standard indicates clearly that expected incomes in that profession met or exceeded that minimum. (AR 00447-454.)  Indeed, many of the shops indicated potential earnings well in excess of that minimum and as an apprentice at Precision Tattoo, Plaintiff earned $11.25 per hour.  (AR 00444, 00458, 00465.)  The information supplied in the Labor Market Survey was specific and credible and Plaintiff offered no evidence to contradict the survey's conclusions. Hartford reasonably relied on the Labor Market Survey regarding potential occupational opportunities for Plaintiff in the tattoo artist market.

[7] Plaintiff argues, again without citation to any case law, that Hartford had an obligation to train him for the other two occupations which it identified in its EAR. (Pl.'s Br. 9.)  Plaintiff cites no law for the proposition that Hartford had any obligation to offer him any type of training, and in fact Plaintiff chose to be trained, at Hartford's expense, as a tattoo artist and set that as his "vocational goal." (AR 00515-00519.)  Plaintiff never argued in his appeal of his denial of benefits that Hartford failed to help him meet his vocational goals.  Indeed, the evidence is to the contrary.   Plaintiff acknowledged that with training in his vocational choice he would be ready to return to work and reasonably employable.  (AR 00519.)

performing, based upon his functional limitations as described by his own treating physician, several jobs that it identified in the relevant geographic area that promised the potential earnings required under the Plan.  Given the nature of Plaintiff's injury and his capability, as defined by his own treating physician, of performing light to sedentary work, this likely fulfilled Hartford's obligation under the Plan.  However, Hartford went beyond this, conducted two separate vocational market studies and engaged Plaintiff in, and fully funded, an apprenticeship training program, so that Plaintiff would unquestionably be adequately trained and qualified in the occupation of his choice.  Plaintiff's ability to actually secure a job was beyond Hartford's responsibilities and likely beyond Hartford's control.  At some point, it became incumbent on Plaintiff to take responsibility for actually finding himself a job.  Hartford, after all, guaranteed disability benefits, not unemployment benefits.

## IV.   CONCLUSION

Hartford conducted a careful, thorough and reasoned analysis of Plaintiff's claim for LTD benefits under the "any occupation" standard and concluded that Plaintiff was qualified by his education, training and experience to perform the essential duties of an occupation which had an earnings potential above that required by the Plan.  Hartford's decision to deny Plaintiff LTD benefits beyond September 27, 2008 was not arbitrary and capricious.  This Court GRANTS Hartford's Motion for Entry of Judgment Affirming the Denial of Long Term Benefits and DENIES Plaintiff's Motion to Reverse Benefits Decision.


IT IS SO ORDERED.

                              S/Paul D. Borman                              
                              PAUL D. BORMAN
                              UNITED STATES DISTRICT JUDGE

Dated:  January 20, 2010

                    CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
January 20, 2010.


                              S/Denise Goodine                              
                              Case Manager

19